United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGETTE A. MEDINA,

        Plaintiff,

    v.

CAROLYN W. COLVIN,

        Defendant.

Case No. 14-cv-01967-DMR

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 20

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff Georgette Medina ("Plaintiff") seeks judicial review of Defendant Social Security Commissioner's ("Defendant" or "Commissioner") final decision denying Plaintiff's application for continuing disability benefits. Both parties have filed motions for summary judgment. After careful consideration of the papers submitted by the parties, the administrative record, and the applicable law, the court **grants** Plaintiff's motion for summary judgment and **denies** Defendant's motion for summary judgment.

## I.    PROCEDURAL HISTORY

On October 21, 2003, Plaintiff filed applications for disability insurance benefits under Title II of the Act and supplemental security income (SSI) benefits under Title XVI of the Act, alleging disability due to neck pain and numbness in the arms. A.R. 61, 64. In a decision dated June 20, 2015, Administrative Law Judge (ALJ) Donald Rector determined that Plaintiff was disabled beginning August 28, 2003 and awarded Plaintiff disability insurance benefits and SSI benefits. A.R. 61-65.

On April 16, 2010, the agency began a Continuing Disability Review. A.R. 281. On April 12, 2011, it determined that Plaintiff's disability had ended on April 1, 2011 and that she was no longer eligible for benefits on the basis of medical improvement. A.R. 100-07. Plaintiff sought reconsideration of that decision, which the agency ultimately upheld, after which Plaintiff

requested a hearing before an ALJ. A.R. 108-152. On July 12, 2012, Plaintiff appeared pro se before ALJ Richard P. Laverdure. Malcolm Brodzinsky, a vocational expert, also provided testimony. A.R. 35-58.

In a decision dated October 29, 2012, ALJ Laverdure found Plaintiff's condition had improved, and that her disability had ended on April 1, 2011. A.R. 17-28. Plaintiff appealed ALJ Laverdure's decision to the Appeals Council, which denied her request for review, making ALJ Laverdure's decision the Commissioner's final decision for purposes of judicial review. A.R. 5-12, 16. Plaintiff subsequently filed this action.

## II.      FACTUAL BACKGROUND

The administrative record contains the following information. Plaintiff was born in San Francisco, California in December 1966, and was 44 years old as of April 1, 2011. A.R. 26-28, 61. She has a 12th grade education, and is literate in English. A.R. 61-62. Up until the 2003 onset date of her disability, Plaintiff worked in various capacities as a clerical employee, a receptionist, a dispatcher for a limousine service, a customer service representative, a delivery driver, and a cargo handler for Federal Express. A.R. 41-45, 62, 311, 366.

### A.      ALJ Rector's Finding of Disability

In the decision dated June 20, 2005, ALJ Rector reviewed the evidence before him and noted that Plaintiff reported the following disabling symptoms: "chronic neck pain, radiating into both shoulders and arms; neck muscle spasms; numbness in both arms; fatigue; and problems sleeping due to pain." A.R. 63. ALJ Rector also noted that Plaintiff "takes significant medication for pain" prescribed to her by the neurosurgeon (Dr. Zavala) who performed the "failed neck surgery" on Plaintiff in 2004. ALJ Rector's review of the medical evidence, which is excerpted in full below, is rather brief:

> According to the most recent report from Dr. Zavala, he is still searching for a cure for this woman (Dr. Zavala raised the spectre of a possible vertebral fracture and is considering sending the claimant for a cervical myelogram, see Exhibit 10F/4). The claimant is also being treated by Dr. Naim S. Katiby (Exhibit 11F).

2

United States District Court
Northern District of California

> I find the claimant's symptom allegations to be fully credible, and supported by medical evidence showing a "severe," medically determinable musculoskeletal impairment which is reasonably likely to be the cause of the symptoms. The medical evidence describes this impairment as degenerative disc disease, cervical spine, with status-post failed anterior cervical discectomy and fusion at the C5-6 level. See e.g. Exhibits 2F/35, 3F/4 (abnormal X-ray report), 5F/5 (Dr. Zavala's operative report dated February 27, 2004), 8F (physical therapy records), 10F/4, 11F. See also the medical sources cited by counsel in her excellent brief (Exhibits 9E).

A.R. 63. ALJ Rector found that Plaintiff had a severe impairment, i.e., "degenerative disc disease, cervical spine, and a failed anterior cervical discectomy and fusion at the C5-6 level." A.R. 64. He determined that Plaintiff "has limited her daily activities to avoid bringing on symptoms, e.g., she does not drive long distances anymore," and Plaintiff "has been on increasing doses of pain medication." A.R. 64. ALJ Rector noted the residual functional capacity (RFC) from Plaintiff's treating physician Dr. Katiby, and found that Plaintiff could not perform her past relevant work or "even 'sedentary' work on a sustained 8 hours/day 40 hours/week basis in a competitive employment setting," and was therefore disabled. A.R. 65. ALJ Rector also ruled that "[i]n view of the possibility of medical improvement with further treatment, and the claimant's young age, I recommend that the SSA review her case one (1) year from the date of this decision." A.R. 65.

It is important to note that the record that ALJ Rector considered, including the medical evidence referenced in ALJ Rector's June 20, 2005 determination of disability, is absent from the administrative record before the court in the present case.

### B.      Undated Function Report

The record contains an undated Function Report completed by Plaintiff apparently in connection with the agency's review of Plaintiff's continuing disability. A.R. 323-330. In the report, Plaintiff stated that she could perform all tasks associated with personal care, except for caring for her hair when it required the use of her shoulders. A.R. 324. Plaintiff could prepare all meals for herself, though she found it "difficult to chop ingredients without feeling pain in shoulders," and could do house work such as cleaning, except that certain tasks (cleaning walls,

3

laundry, household repairs, and carrying heavy objects) cause inflammation in her neck and back. A.R. 325. She could drive, walk, take public transportation, and go out alone, and could do all her shopping by herself. A.R. 326. She could pay bills and count change. A.R. 326. Plaintiff could engage in social activities, although she found herself sometimes irritated due to her physical discomfort. A.R. 327-28.

### C.   November 17, 2011 Determination by Disability Hearing Officer

On November 17, 2011, Disability Hearing Officer (DHO) Annabelle Acosta determined that Plaintiff's impairments had improved such that she was no longer disabled. A.R. 124-134. In reaching this decision, the DHO reviewed Plaintiff's then-current medical and vocational records. She also reviewed the medical and vocational reports available at the Comparison Point Decision (CPD), i.e., the June 20, 2005 determination that Plaintiff was disabled, which included the physical RFC questionnaire completed by Dr. Katiby on May 10, 2005, and records from Dr. Zavala dated May 6, 2004 to July 27, 2004. A.R. 124.

Citing the 2004 and 2005 records from Dr. Katiby and Dr. Zavala, the DHO noted that "at the comparison point decision, [Plaintiff] was granted disability benefits by the [ALJ] … based on less than sedentary residual functional capacity secondary to a severe cervical spine impairment. [Plaintiff] had symptoms of chronic pain radiating into both shoulders and arms, neck muscle spasms, numbness in both arms, fatigue, and sleeping problems due to pain." A.R. 128. The DHO also noted that, at the time of the CPD, Plaintiff "took significant medications for pain" and "had constant moderate to severe pain along with tingling and numbness intermittently" and "depression and anxiety." A.R. 128.

The DHO then reviewed the then-current medical evidence. She concluded that "[b]ased on the totality of the medical evidence in the file, there is significant medical improvement of [Plaintiff's] orthopedic impairments since the comparison point decision." A.R. 129. The DHO also found that "[t]here is no medically determinable mental impairment that can be established

4

given the absence of ongoing treatments and medications for the alleged depression."[1]  A.R. 129.

### D.      Testimony at July 12, 2012 Hearing

Plaintiff testified at the July 12, 2012 hearing before ALJ Lavedure that after the 2005 disability disability determination, she briefly worked from June to December 2009, when she performed administrative work for a newspaper.  A.R. 42, 291.  However, she left the job because it required her to sit for long periods of time, which caused problems in her back, neck, and shoulder.  A.R. 42.

Plaintiff also testified that her hands "lock," causing pain which could sometimes cause difficulty in grasping things.  Plaintiff explained that she uses a pillow when she drives because of swelling in her lower back.  A.R. 45.  She also stated that when she walks, she sometimes experiences pain that will "stop [her] in [her] tracks."  A.R. 45.  Plaintiff testified that her back and neck pain affected her ability to turn and to look up and down.  A.R. 46.  She testified that she was currently taking baclofen, naproxen, and ibuprofen.  A.R. 47.

Plaintiff informed ALJ Laverdure that in May 2012, she had seen Dr. Vicki Economou, a neurology consultant.  She further testified that she had been under the care of Dr. Katiby and Dr. Najib Saifulrahman.  She explained that she had received acupuncture treatment, which alleviated the swelling in her neck and shoulders, but had ceased those treatments when they were no longer covered by her insurance, because she could no longer afford it.  A.R. 46-47, 50, 368.  ALJ Laverdure stated at the hearing that the agency would "obtain the records from Dr. Katiby's office, whatever [the office] will produce for [them]. . . [b]ecause it [did not] look like anybody tried to get those records yet."  A.R. 50, 57.

The ALJ presented a hypothetical to vocational expert (VE) Malcolm Brodzinksy.  The hypothetical assumed a person with "capacity for light work, with no ladders, ropes, scaffolds; crouch, crawl, stoop, kneel, balance and use of ramps and stairs occasional; also stand at will

---

[1]  Plaintiff does not dispute the agency's finding that she does not have a medically determinable mental impairment.

5

United States District Court
Northern District of California

option; avoid extremes of cervical spine motion, either side to side or up or down; avoid extreme motion; with the non-dominant right upper extremity, no forceful gripping, grasping. . . [w]ith the. . . dominant left upper extremity, avoiding heavy or forceful pushing or pulling … nothing to exceed the ten to twenty pound limit ." A.R. 53-54. ALJ Laverdure asked the VE if a person with this RFC could perform Plaintiff's past work. The VE opined that such a person would not be able to perform general office clerk work because the sit/stand at will option would not be available for that position. A.R. 54.

ALJ Laverdure then asked whether there were "any other jobs in the economy at the sedentary or light level that could be performed within the parameters of [the aforementioned] hypothetical." A.R. 54. The VE testified that there were unskilled jobs that could be performed by a person with the hypothetical RFC, including cashier, and bench hand inspector of electronic components. A.R. 55-57. The VE noted that the DOT descriptions for both positions do not explicitly include a sit/stand at will option,[2] but "[the VE's] professional expertise tells [him] that [these] job[s] allow for a sit/stand option." A.R. 55-56.

### E.    Medical Evidence of Record

#### 1.    June 2008–October 2012: Aaftab Medical Center Records

As previously noted, the record in this case does not include any of the medical evidence upon which ALJ Rector based his June 20, 2005 finding of disability. The bulk of the medical evidence comprises records dated 2008 to 2012 from Aaftab Medical Center, where Plaintiff received primary care. A.R. 347, 367-68. Plaintiff identified her treating physicians as Dr. Katiby, and later Dr. Saifulrahman. A.R. 46, 50, 367.

The records from Aaftab include notes from three visits in September and October 2008, during which Plaintiff sought treatment for congestion, sinus problems, and Bell's palsy (i.e., weakness or paralysis in the muscles on one side of the face). A.R. 500-502. There are no

---

[2] The VE noted that the Dictionary of Occupational Titles (DOT) "does not discuss the sit/stand option," because when the DOT was developed, there was no sit/stand options available, but certain jobs had emerged as jobs with sit/stand options. A.R 55.

United States District Court
Northern District of California

United States District Court
Northern District of California

treatment notes from 2009.

The record also includes four visits to Aaftab in 2010, as well as two missed appointments. *See* A.R. 384 (January 2010 treatment note regarding an infection unrelated to neck or back pain); 385 (January 6, 2010 treatment note; Plaintiff complained of stuffy nose and congestion); 383 (May 12, 2010 missed appointment); 382 (May 28, 2010 treatment note; Plaintiff received medication refills and complained of back pain); 381 (November 2010 treatment note; Plaintiff complained of ear and sinus problem; physician noted no negative physical finding in Plaintiff's extremities); 380 (December 2010 missed appointment). During the May 28, 2010 visit, Plaintiff's physician noted a diagnosis of cervical and back pain and prescribed Motrin. A.R. 382.

There are six treatment notes from 2011. In February 2011, Plaintiff was treated for a sinus infection and pain in her shoulder and back. A.R. 498. Her physical exam showed congestion and abnormalities in her hands and fingers. A.R. 498. On April 4, 2011, Plaintiff saw her physician for lower back pain and lightheadedness. A.R. 497. Plaintiff's progress notes from her physical exam indicate no abnormalities. A.R. 497. On April 27, 2011, Plaintiff visited her physician for a checkup. A.R. 496. Her doctor conducted a physical examination and found neck and back pain. A.R. 496. On May 4, 2011, Plaintiff saw her doctor for another checkup, and her doctor found abnormalities in her neck, and in her extremities (arms, wrists, back and chest), and diagnosed Plaintiff with cervical radiculopathy and peripheral neuropathy. A.R. 495. On May 25, 2011, Plaintiff was treated for head pain, coughing and sneezing. A.R. 493. The physician also noted Plaintiff's back pain. A.R. 493. In June 2011, Plaintiff saw her physician to follow up on her sinusitis, and to look at a lipoma on her neck. A.R. 494.

On January 2, 2012, Plaintiff saw her physician with complaints of sinus pain, tendonitis, ear pain, and tiredness. A.R. 487. On January 23, 2012, Plaintiff was treated for acute sinusitis and bronchitis. A.R. 480. On March 5, 2012, Plaintiff saw her physician for blood test results; the physician also noted that Plaintiff experienced tenderness in her neck at C5-C6 and in her back. A.R. 479. On April 16, 2012, Plaintiff physician saw her for a follow-up appointment, during

7

United States District Court
Northern District of California

which a physical examination indicated neck and back pain. A.R. 475. On June 18, 2012, Plaintiff was treated for conjunctivitis in her eye and hand pain; the treating physician also noted tenderness in Plaintiff's back at the C5-C6 level. A.R. 474. On October 3, 2012, Plaintiff saw her physician with a complaint of sinus issues, and soreness and tenderness in her arms. The physician noted pain in Plaintiff's neck, shoulder, and back. A.R. 486. On October 29, 2012, Plaintiff sought treatment for sore throat, fever, and problems with the right side of her face. A.R. 492. The record also includes PET scans for heart problems (A.R. 488-90) and the results of a mammogram (A.R. 503).

### 2.       November 2011: Radiology Report

In November 2011, Dr. Katiby referred Plaintiff to Silicon Valley Medical Imaging for CT scans of her cervical spine and lumbar spine. A.R. 456-57.Dr. Purushottam Dixit analyzed the cervical spine CT scan and noted "[s]traightening of the normal cervical lordosis," or loss of curve. Dr. Dixit found some facet arthropathy bilaterally at the C3-4, B4-5, and C5-6 levels; mild-to-moderate compromise of the neural foramina bilaterally at the C5-6 level; and a questionable left posterolateral protrusion of the intervertebral disk at the C6-7 level. A.R. 25, 457. Dr. Dixit suggested that Plaintiff be further evaluated with "clinical correlation and MRI." A.R. 457.

Dr. Dixit analyzed the lumbar spine CT scan and found minimal-to-mild disk bulging at the L2-3, LS-4, L4-4, and L5-S1 levels. A.R. 456. Dr. Dixit's impression was that Plaintiff had "spinal stenosis, in addition to mild to moderate bilateral facet arthropathy" at all of those levels, plus "slight concentric compromise of the thecal sac at L5-S1 level on the basis of likely epidural lipomatosis." A.R. 456. Dr. Dixit suggested that Plaintiff be further evaluated with clinical correlation and a follow-up MRI. A.R. 456.

### 3.       September 2005–May 2009: Daniel B. Kim Acupuncture

On Dr. Katiby's referral, Plaintiff sought treatment from Daniel B. Kim, a licensed acupuncturist. A.R. 463-70. Between 2005 and 2009, Plaintiff saw Mr. Kim 44 times for neck, upper back, and shoulder pain, and facial palsy.

8

#### 4.        February 2011: Examination by Dr. Feng Bai

The record includes a February 2011 orthopedic evaluation by consulting physician Dr. Bai, performed at the request of the agency.  A.R. 25.  Plaintiff's chief complaints included "[l]ower back pain, upper back pain, neck pain, shoulder pain, left hand pain, and foot pain."  A.R. 387.  Dr. Bai noted that Plaintiff was "injured at work in a motor vehicle accident and underwent surgery of her left C5-C6 in 2004."  A.R. 387.  Dr. Bai stated that Plaintiff received physical therapy and surgery for her neck pain, and that she was currently taking Ibuprofen.  A.R. 387. Dr. Bai noted that Plaintiff had reported that she still felt pain in the aforementioned areas.  A.R. 387.

Dr. Bai also reviewed Plaintiff's previous medical records, including those which were relevant to the 2005 disability determination.  A.R. 63, 386.  Dr. Bai noted that on June 17, 2004, neurosurgeon Dr. Luis Zavala had indicated that Plaintiff had complained of tightness in the neck area and occasional numbness and tingling down to the left upper extremity following her surgical fusion at the C5-C6 level, but in general, Plaintiff had acknowledged to Dr. Zavala that she was doing "much better than preoperatively."  A.R. 386.  On July 27, 2004, Dr. Zavala noted that Plaintiff continued to complain of pain and continued to take Tylenol No. 4 but could not tolerate muscle relaxant medication.  A.R. 387.  Dr. Zavala also noted that an X-ray taken of Plaintiff's cervical spine on June 27, 2004 "showed no evidence of change in alignment at C5-C6 area, but there appeared to be a slight fracture in the C5 vertebral body," and that additional testing may be needed.  A.R. 387.  Dr. Zavala found that Plaintiff's range of motion was "moderately restricted," and "[n]o focal, motor, or sensory deficits were found."  A.R. 387.  Dr. Bai also reviewed a cervical CT report from 2004 which showed a plate and screw fixation at Plaintiff's C5-C6 level; the report also indicated that her vertebral body alignment was mildly abnormal with straightening of the cervical lordosis between TI and T6.  A.R. 387.

Dr. Bai also referenced an undated RFC questionnaire, in which Plaintiff indicated that she had anxiety and depression, but that she was capable of a low stress job, and that her physical condition symptoms were getting better with physical therapy.  A.R. 387.  In the RFC questionnaire, Plaintiff stated that she was able to stand for more than two hours, sit about four

9

hours, and walk for about 60 minutes per day.  A.R. 387.

Dr. Bai conducted a physical examination and observed Plaintiff "sitting, standing, walking, and changing position, without difficulty," and "ambulat[ing]with a normal gait."  A.R. 389.  With respect to Plaintiff's neck, Dr. Bai noted that her "cervical spine range of motion was decreased due to neck pain and surgery," but found "no spinous process or paraspinal tenderness" and "normal spine contour."  A.R. 389.  With respect to Plaintiff's back, Dr. Bai found that her "[l]umbar spine range of motion ha[d] mildly decreased," but that she had no muscle spasm, tenderness, or scars, and "no pain with range of motion[,]…no pain with axial rotation of the trunk[,]…[and] no pain with axial loading of the spine at the head."  A.R. 389.  Plaintiff's ranges of motion in her shoulders, elbows, wrists, fingers, hips, knees, and ankles were within normal limits.  A.R. 25, 389.  Dr. Bai noted "mild tenderness in the cervical paraspinal muscle area without muscle spasm," in addition to "mild tenderness in the left forearm."  A.R. 390.  Dr. Bai found no tenderness in the hands, wrists, feet, or shoulder. A.R. 390.

Based on his examination and review of Plaintiff's records, Dr. Bai found that Plaintiff was able to carry and lift 20 pounds occasionally and 10 pounds frequently, stand and walk six hours of an eight-hour workday, and sit for six hours of an eight-hour workday, with no pushing or pulling limitations other than carrying or lifting, and no manipulative limitation in the upper extremities preventing her from reaching in all directions to perform gross or fine manipulation, except that Plaintiff "should avoid very forceful or highly pushing and pulling with her left hand due to mild chronic tendinitis in her left forearm."  A.R. 25, 391.

### 5.    May 2012: Dr. Vicky Economou

Neurology consultant Dr. Economou examined and performed nerve conduction studies on Plaintiff on May 7, 2012, upon treating physician Dr. Saifulrahman's referral.  A.R. 458-62.  Plaintiff told Dr. Economou that she experienced numbness in her left fingers and left forearm, and stiffness in her right fingers.  A.R. 458.  Plaintiff also reported that she felt "intermittent low back pain."  A.R. 461.

10

United States District Court
Northern District of California

Dr. Economou described Plaintiff as "a well-developed, obese, very pleasant individual in no apparent distress." A.R. 461. Plaintiff's "general physical exam was unremarkable." A.R. 461. Dr. Economou noted that Plaintiff's speech, mental status, sensory examination, and gait were all "normal," that her muscle tone was "normal in all extremities," that her strength was "5 out of 5 in all muscle groups," her reflexes were "+2 and symmetrical with plantar responses flexor bilaterally," and her cerebellar testing was "unremarkable." A.R. 461-62. Dr. Economou noted that Plaintiff's past medical history included right-sided Bell's palsy and bilateral carpal tunnel syndrome. She found "mild to moderate right carpal tunnel syndrome (median nerve entrapment at wrist) affecting sensory and motor components, without evidence of ongoing denervation" upon performing a musculoskeletal examination of Plaintiff. A.R. 460, 462. Dr. Economou also found "mild to moderate cervical radiculopathy at the left C5 level," and "no evidence of peripheral neuropathy." A.R. 460. Dr. Economou's impression was "cervical spondylosis with persistent symptoms" and "rule out right carpal tunnel syndrome." A.R. 462.

### 6.      October 2012: Radiology Report

The record also includes a radiology report from a chest X-ray conducted at the request of Dr. Katiby because of Plaintiff's symptoms of cough and congestion. A.R. 505. The report found no evidence of acute cardiopulmonary process. A.R. 505.

### III.      CONTINUING DISABILITY EVALUATION PROCESS

An individual is disabled for the purpose of receiving benefits under the Act if she demonstrates a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[3] that is expected to result in death or last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful

---

[3]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

11

United States District Court
Northern District of California

employment that exists in the national economy. *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

After a person is found to be entitled to disability benefits, the Commissioner is required to periodically review whether continued entitlement to such benefits is warranted. 42 U.S.C. § 421(i); 20 C.F.R. §§ 404.1588-1598. A claimant's benefits cannot be terminated unless substantial evidence demonstrates medical improvement in her impairment such that the claimant is able to engage in substantial gainful activity and is therefore no longer disabled. See 42 U.S.C. § 423(f)(1); 42 U.S.C. § 1382c(a)(4); 20 C.F.R. § 416.994; *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1459-60 (9th. Cir. 1995). To determine if the claimant continues to be disabled, an ALJ conducts an eight-step inquiry for the Title II claim, and an almost identical seven-step inquiry for the Title XVI claim. 20 C.F.R. §§ 404.1594, 414.994.

### A.      Title II Eight-Step Process

1.      At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. If the claimant is performing substantial gainful activity and any applicable trial work period has been completed, the ALJ will find that the claimant is no longer disabled.

2.      At the second step, the ALJ determines whether the claimant has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant does, the ALJ will find that the claimant continues to be disabled.

3.      At the third step, the ALJ determines if medical improvement has occurred. If medical improvement has occurred, the ALJ will proceed to step four. If medical improvement has not occurred, the ALJ proceeds to step five.

4.      At the fourth step, the ALJ determines whether medical improvement is related to the claimant's ability to work. If it is, the ALJ proceeds to step six.

5.      At the fifth step, the ALJ determines whether an exception to medical improvement applies. There are two groups of exceptions. 20 C.F.R. §§ 404.1594(d)(e), 416.944(b)(3)-(4). If

12

United States District Court
Northern District of California

one of the first group of exceptions applies, the ALJ will go to step six. If one of the second group of exceptions applies, the ALJ will find that the claimant's disability has ended.

6.      At the sixth step, the ALJ determines whether all the claimant's current impairments in combination are severe within the meaning of 20 C.F.R. § 404.1594(f)(6), 414.994(b)(5)(v). If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the ALJ will find that the claimant is no longer disabled.

7.      At the seventh step, the ALJ assesses the claimant's RFC based on her current impairments and determines if she can perform past relevant work. If the claimant has the capacity to perform past relevant work, the ALJ will find that the claimant's disability has ended. If not, the ALJ proceeds to the final step.

8.      At the eighth and final step, the ALJ determines whether other work exists in significant numbers in the national economy that the claimant can perform, given her RFC and considering her age, education, and past work experience. If the claimant can perform other work, the ALJ will find that she is no longer disabled. If the claimant cannot perform other work, the ALJ will find that her disability continues.

### B.      Title XVI Seven-Step Process

For a Title XVI claim, the inquiry is identical to the Title II eight-step process except the ALJ does not follow Step One of the Title II inquiry. 20 C.F.R. § 416.994(b)(5).

### IV.      THE ALJ'S OCTOBER 29, 2012 DECISION

In the October 29, 2012 decision, ALJ Laverdure applied both the eight and seven-step analyses to determine whether Plaintiff's disability continued. A.R. 20-27. At Step One of the Title II analysis, the ALJ found that prior to April 1, 2011—the date that the agency determined Plaintiff's disability had ended—Plaintiff had not engaged in substantial gainful activity, because although she had returned to work during a trial period, she was unable to continue working and could not complete the trial period. A.R. 22; see 20 C.F.R. § 404.1594(f)(1). At Step Two, the ALJ found that Plaintiff's current impairments as of April 1, 2011 included the following

13

United States District Court
Northern District of California

medically determinable impairments: cervical degenerative disc disease, status post-2004 fusion; right carpal tunnel syndrome; and obesity. A.R. 22. However, the ALJ determined that after considering all of Plaintiff's listed impairments individually, and in combination with one another, that since April 2011, Plaintiff did not have an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. A.R. 22.

At Step Three, the ALJ found that medical improvement occurred as of April 1, 2011 because the medical evidence supported the fact that there had been a decrease in the medical severity of Plaintiff's impairments since the CPD. A.R. 22-23. In reaching this finding, the ALJ focused on the fact that Plaintiff "has had very little recent treatment for her musculoskeletal complaints"; that the treatment Plaintiff had received had been conservative; that Plaintiff's appearance and demeanor at the hearing was generally unpersuasive; and that Dr. Bai opined that Plaintiff had limitations that still permitted some work. A.R. 25-26. The ALJ also took note of the November 2011 CT scan of Plaintiff's cervical spine, the May 2012 nerve conduction study performed by Dr. Economou, and Plaintiff's testimony. A.R. 25.

At Step Four, the ALJ determined that the medical improvement in Plaintiff's condition increased her RFC, and thus found the medical improvement to be related to Plaintiff's ability to work. A.R. 23. Because Step Five did not apply, the ALJ moved to Step Six and found that Plaintiff continued to have severe impairments. A.R. 23. At Step Seven, the ALJ assessed Plaintiff's RFC based on her current impairments and determined that she has been unable to perform past relevant work as a general office worker since April 1, 2011. A.R. 26. At Step Eight, the ALJ determined that beginning on April 1, 2011, considering Plaintiff's age, education, work experience, and RFC based on her current impairments, Plaintiff has been able to perform a significant number of jobs in the national economy. A.R. 26. Thus, the ALJ held that claimant's disability ended on April 1, 2011, and that she had not become disabled again since that date. A.R. 27.

14

## V.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court has the authority to review the Commissioner's final decision to determine whether it was: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  *See Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir.1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  It is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See *Howard v. Heckler*, 782 F.2d 1484, 1487 (9th Cir.1986); *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  *See Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.1989).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony, resolving ambiguities, and drawing inferences logically flowing from the evidence. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982); *Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, *see Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir.2002), and may be set aside only if an improper legal standard was applied.  *See Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir.1988).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quotation marks omitted).

15

**VI.     DISCUSSION**

As a preliminary matter, the parties dispute whether a claimant in a case concerning the termination of disability benefits is entitled to a presumption of continuing disability. Plaintiff believes she is so entitled, citing *Bellamy v. Sec. of Health & Human Services*, 755 F.2d 1380 (9th Cir. 1985). Defendant argues that amendments to the Act not taken into consideration by the *Bellamy* court have eliminated the presumption.

Regarding the merits of the case, Plaintiff contends that ALJ Laverdure erred in finding medical improvement because he failed to compare medical evidence from the CPD with current medical evidence. Plaintiff also argues that substantial evidence does not support a finding of medical improvement in Plaintiff's back problems; that ALJ Laverdure erred in discounting the credibility of Plaintiff's statements about the severity of her symptoms; and that ALJ Laverdure erred because substantial evidence does not support the conclusion that there are a significant number of jobs available that Plaintiff could perform given her RFC.

**A.       Presumption of Continuing Disability**

Generally, a claimant for Social Security disability benefits bears the burden of proving disability. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir.1999). However, in *Bellamy*, the Ninth Circuit held that "[o]nce a claimant has been found to be disabled… a presumption of continuing disability arises in her favor," and the burden shifts to the Secretary to "produc[e] sufficient evidence to rebut this presumption of continuing disability." 755 F.2d at 1381. Plaintiff argues that, based on *Bellamy*, this court must apply the presumption of continuing disability in evaluating whether the ALJ erred in determining that Plaintiff was no longer disabled.

Some of the 1984 amendments to the Act addressed the medical improvement standard. As amended, the Act now provides: "Any determination made under this section shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, *without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled*." 42 U.S.C. § 423(f) (emphasis added). *See also* 42 U.S.C. § 1382c(a)(4) (same). These amendments became

16

United States District Court
Northern District of California

United States District Court
Northern District of California

effective on October 9, 1984, after *Bellamy* had been argued and submitted.  The *Bellamy* decision was issued in March 1985, and it did not take the amendments into consideration.   Defendant thus argues that the 1984 amendments eliminated any presumption of continuing disability, and *Bellamy* was effectively overruled by statute on this point.

The state of the Ninth Circuit law on this point is far from clear.  For example, although not cited by Defendant, the court notes that in 1986 the Ninth Circuit issued *Warren v. Bowen*, 804 F.2d 1120 (9th Cir. 1986).  In recognizing a presumption of continuing disability, *Bellamy* relied on *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983), which in turn relied upon *Patti v. Schweiker*, 669 F.2d 582 (9th Cir. 1982).  In *Warren*, the claimant was terminated from disability benefits.  She later reapplied and was rejected, leading to her appeal.  Citing *Patti*, the claimant argued that she was entitled to a presumption of continued disability.  The *Warren* court first noted that *Patti* was distinguishable, because it involved a claimant who was on disability benefits, rather than one such as Warren, who had been terminated from benefits and was reapplying.  In somewhat cryptic dicta, *Warren* stated that *Patti* "was undercut by Congress's decision in 1984 to codify the presumption that *Patti* created.  *See* 42 U.S.C.A. § 1382(a)(5) (1983 Supp. 1986).  We must now look to the statute and the regulations for guidance.  These support the Secretary's position."  804 F.2d at 1121.

Plaintiff contends that the Ninth Circuit has affirmed the presumption of continuing disability in at least one decision subsequent to *Bellamy* and the 1984 amendments.  In *Parra v. Astrue*, the Ninth Circuit stated, "As *Bellamy* makes clear, the Commissioner's burden in termination cases stems from the notion that "[o]nce a claimant has been found . . . disabled [ ] a presumption of continuing disability arises in [her] favor."  481 F.3d 742, 748 (9th Cir. 2007) (emphasis omitted).  *Parra* does not address *Warren*, nor does it analyze the effect of the 1984 amendments.  Moreover, the *Parra* court was not squarely addressing the present issue, because the question before the court was whether the claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material to his disability, not whether a presumption

17

of continuing disability exists.[4]

This court finds that *Bellamy* and *Parra* represent the current state of the Ninth Circuit law on this question. *Bellamy* clearly recognized a presumption of continuing disability; more than twenty years after *Bellamy* and *Warren*, the Ninth Circuit reaffirmed the existence of the presumption in *Parra*, albeit in dicta.

Indeed, the 1984 amendments do not clearly overturn the presumption of continuing disability. Rather, the amendments prohibit "any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled." 42 U.S.C. § 423(f); 42 U.S.C. § 1382(a)(5). An inference is not the same as a presumption. As noted in *Bellamy*, the presumption of continuing disability shifts the burden of production to "produc[e] sufficient evidence to rebut this presumption of continuing disability." 755 F.2d at 1381. By contrast, "[a]n inference is distinguished from a presumption in that in an inference, the existence of [one fact] may be deduced from [another fact] by the ordinary rules of reasoning and logic." Weinstein's Federal Evidence, § 301.02 [emphasis omitted]. *See also Palacios v. Astrue*, 10-cv-1743-AJW, 2012 WL 601874, at *2-3 (C.D. Cal. Feb. 23, 2012) (following *Bellamy* and *Parra*, and noting that a "presumption of continuing disability" does not create "a substantive 'inference' of continuing disability.")

In sum, this court must apply a presumption of continuing disability to Plaintiff's claim. However, as noted in *Patti*, "the burden is still on [the claimant] to prove her case. All the presumption does is impose on the [Commissioner] a burden to come forward with evidence that her condition has changed." *Patti*, 669 F.2d at 587.

---

[4] Other circuits have addressed the amendments and found a clear conflict between the presumption and the statutory language. *See Cutlip v. Secretary of HHS*, 25 F.3d 284, 286 n. 1 (6th Cir.1994) (holding that the district court erred in applying a presumption of continuing disability, observing that Sixth Circuit decisions after the 1984 amendments had mistakenly continued to recognize the presumption without addressing the "clear conflict" between such a presumption and the language of revised Section 423(f)); *Rhoten v. Bowen*, 854 F.2d 667, 669 (4th Cir. 1988) (presumption of continuing disability eliminated in 1984 amendments).

18

**B.      ALJ's Alleged Failure to Compare Prior and Current Medical Evidence**

Plaintiff argues that ALJ Laverdure committed error when he found medical improvement without comparing the objective medical findings from the CPD in 2005 with Plaintiff's subsequent medical records.

Medical improvement is "any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that [the claimant] was disabled or continued to be disabled and is determined *by a comparison of prior and current medical evidence* which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1594(b)(1) (emphasis added); 404.1594(c)(1) (same). *See also* 20 C.F.R. § 404.1594(b)(7) ("For purposes of determining whether medical improvement has occurred, we will compare the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled to the medical severity of that impairment(s) at that time.").

"The Ninth Circuit Court of Appeals appears not to have addressed the precise manner of the comparison an administrative law judge must perform in evaluating whether a claimant has experienced a medical improvement." *Lee v. Astrue*, No. 2:10-CV-03162 KJN, 2012 WL 928741, at *5 (E.D. Cal. Mar. 19, 2012). "However, appellate decisions of other Circuit Courts support the conclusion that in assessing medical improvement the administrative law judge must evaluate not only the current medical evidence, but also the medical evidence upon which the claimant's original disabled status was premised." *Id. See Byron v. Heckler,* 742 F.2d 1232, 1236 (10th Cir. 1984) ("In order for evidence of improvement to be present, there must also be an evaluation of the medical evidence for the original finding of disability….This failure to apply the correct legal standard is, by itself, sufficient to command reversal in the case."); *Vaughn v. Heckler,* 727 F.2d 1040, 1043 (11th Cir. 1984) (holding that the administrative law judge erred by focusing only on the current evidence of the claimant's impairments and without an evaluation of the medical evidence upon which the claimant was originally found disabled, and finding that "[w]ithout such

19

United States District Court
Northern District of California

United States District Court
Northern District of California

a comparison, no adequate finding of *improvement* could be rendered") (emphasis in original). The court agrees that the plain language of 20 C.F.R. §§ 404.1594(b)(1) and (c)(1) requires the ALJ to actually compare prior and subsequent medical records in order to determine the existence of medical improvement.

ALJ Laverdure's opinion does not address prior medical evidence. In fact, ALJ Laverdure appears not to have considered prior medical evidence at all, since those prior records do not appear in the administrative record submitted by the Commissioner to this court. Instead, as summarized above, the ALJ cited exclusively to *current* medical evidence.

ALJ Laverdure's opinion does reference other reports which include summaries of the prior medical evidence, notably the DHO's decision (A.R. 124-134) and Dr. Bai's examination report (A.R. 386-391). As described above, both the DHO and Dr. Bai compare the prior and current medical evidence and note specific reasons for concluding that Plaintiff's impairments have improved. However, making reference to the DHO's and Dr. Bai's opinions cannot substitute for the ALJ's own obligation set forth in 20 C.F.R. §§ 404.1594(b)(1) that *the ALJ* compare prior to current medical evidence. *See, e.g.*, *Veino v. Barnhart*, 312 F.3d 578, 587 (2d Cir. 2002) ("The Commissioner also argues that the record before us is adequate because the 1982 medical evidence was summarized in the Hearing Officer's decision….The difficulty with the Commissioner's position is that these decisions are not evidence....without any of the 1982 medical evidence in the record before us, this Court cannot make a reasoned determination as to whether the DHO's summary is accurate or adequate."); *Bartruff v. Astrue*, No. CIV. 12-571-GPM-CJP, 2013 WL 498790, at *7 (S.D. Ill. Jan. 10, 2013) *report and recommendation adopted*, No. CIV. 12-571-GPM, 2013 WL 498788 (S.D. Ill. Feb. 8, 2013) (finding that ALJ erred by not comparing past and current medical evidence, and that comparison of that evidence by DHO did not suffice because it was not ALJ's decision).

Defendant does not address Plaintiff's argument that ALJ Laverdure erred because he failed to compare prior and current medical evidence. Defendant does not argue that a comparison

20

United States District Court
Northern District of California

of past and current medical evidence is not required, nor does it assert that ALJ Laverdure actually made the required comparison. Instead, Defendant offers its own comparison of the prior and current medical evidence: "At the time of the CPD, the ALJ found that Plaintiff was limited to less than sedentary work; however, based on the current medical record, the ALJ found that Plaintiff was now capable of a range of light work as of April 1, 2011." Def.'s Mot. [Docket No. 20] at 6-7. This does not address the ALJ's fundamental failure to conduct the proper analysis in the first instance. *Bartruff*, 2013 WL 498790, at *7 ("The Commissioner's after-the-fact comparison of prior and current medical evidence cannot be relied upon to defend the ALJ's decision where the ALJ made no such comparison himself.") (citations omitted).

ALJ Laverdure's failure to compare prior to current medical evidence is not harmless. Defendant's briefing focuses on the results of Plaintiff's examinations with Dr. Economou and Dr. Bai, and her conservative treatment by Dr. Katiby and Saifulrahman, and contends that the ALJ did not err because the current medical evidence supports the ALJ's determination of Plaintiff's RFC. But an ALJ may not move to the evaluation of a claimant's RFC without first finding medical improvement, and the Act does not authorize an ALJ to find medical improvement without making the comparison of prior and current medical evidence. A termination decision is not "legally proper and supported by substantial evidence when the CPD evidence is absent from the record." *Spratt v. Colvin*, No. CIV-13-299-D, 2014 WL 2153933 at *5 (W.D. Okla. May 20, 2014). "In the absence of the early medical records, the administrative record lacks a foundation for a reasoned assessment of whether there is substantial evidence to support the Commissioner's finding that [a claimant's current] condition represents an 'improvement.'" *Veino*, 312 F.3d at 587 (remanding for supplementation of the record and further consideration where the current administrative record contained no prior medical evidence). *See also Osborn v. Barnhart*, No. 03-M-2529, 2004 WL 2091480, at *2 (D. Colo. Aug. 6, 2004) ("While earlier medical records are in the file and the ALJ said that he gave careful consideration to all the evidence, he did not say how he compared the symptoms, signs and laboratory findings, in those earlier records with the later

21

reports….[Thus] [t]he ALJ's analysis was improper under the law and the decision therefore must be reversed for legal error.").[5]

ALJ Laverdure erred by failing to consider prior medical evidence, and that error was consequential to the remainder of his analysis.[6]

## VII.   CONCLUSION

For the reasons stated above, the court finds that ALJ Laverdure's decision is not fully supported by substantial evidence in the record.  The court **denies** Defendant's motion for summary judgment and **grants** Plaintiff's motion for summary judgment, and **remands** the case to the Commissioner for consideration by ALJ Laverdure of the prior medical evidence relevant to ALJ Rector's 2005 decision.

**IT IS SO ORDERED.**

Dated: August 21, 2015

_____
Donna M. Ryu
United States Magistrate Judge

---

[5]  Defendant's brief provides an example of how the court cannot make an assessment of whether substantial evidence supports ALJ Laverdure's finding without reviewing prior medical evidence. Plaintiff contends that the November 2011 CT scans show disc protrusions and other injuries not visible in Plaintiff's 2004 CT scans.  Pl.'s Mot. [Docket No. 19] at 16.  Defendant's response focuses solely on the meaning of the 2011 CT scans, without acknowledging the findings of the 2004 CT scans or pointing to the place in the administrative record where the 2004 CT scans can be found.  Def.'s Mot. at 6 n. 1.

[6]  Because the court finds that remand is appropriate in light of the ALJ's failure to consider the prior medical evidence, the court does not reach the other arguments raised by Plaintiff.

22